Slip Op. 18-166

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| CHANGZHOU TRINA SOLAR ENERGY CO., LTD., and TRINA SOLAR (CHANGZHOU) SCIENCE & TECHNOLOGY CO., LTD., |
| Plaintiffs, |
| CANADIAN SOLAR INC., CANADIAN SOLAR INTERNATIONAL, LTD., CANADIAN SOLAR MANUFACTURING (CHANGSHU), INC., CANADIAN SOLAR MANUFACTURING (LUOYANG), INC., CANADIAN SOLAR (USA) INC., CSI CELLS CO., LTD., CSI SOLAR POWER (CHINA) INC., CSI SOLARTRONICS (CHANGSHU) CO., LTD., CSI SOLAR TECHNOLOGIES INC., and CSI SOLAR MANUFACTURE INC., |
| Plaintiff-Intervenors, |
| v. |
| UNITED STATES, |
| Defendant. |
| SOLARWORLD AMERICAS, INC., CHANGZHOU TRINA SOLAR ENERGY CO., LTD., and TRINA SOLAR (CHANGZHOU) SCIENCE & TECHNOLOGY CO., LTD., |
| Defendant-Intervenors. |

Before: Jane A. Restani, Judge

Consol. Court No. 17-00198

PUBLIC VERSION

## OPINION AND ORDER

Dated: November 30, 2018

[Commerce's <u>Final Results</u> in the Third Administrative Review of Commerce's Countervailing Duty Order pertaining to photovoltaic cells from the People's Republic of China are partially sustained and partially remanded for reconsideration consistent with this opinion.]

<u>Robert Gosselink</u>, and <u>Jonathan Freed</u>, Trade Pacific, PLLC, of Washington, D.C., for Plaintiffs and Defendants-Intervenors Changzhou Trina Solar Energy Co., Ltd. and Trina Solar (Changzhou) Science & Technology Co., Ltd.

<u>Craig Lewis</u>, Hogan Lovells US LLP, of Washington, D.C., for Consolidated Plaintiffs Shanghai BYD Co., Ltd. and BYD (Shangluo) Industrial Co., Ltd.

<u>Jeffrey S. Grimson</u>, <u>Kristin H. Mowry</u>, <u>Jill A. Cramer</u>, <u>Sara M. Wyss</u>, <u>James C. Beaty</u>, and <u>Bryan P. Cenko</u>, Mowry & Grimson, PLLC, of  Washington, D.C., for Plaintiffs-Intervenors Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar Manufacturing (Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., Canadian Solar (USA) Inc., CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solartronics (Changshu) Co., Ltd., CSI Solar Technologies Inc., and CSI Solar Manufacture Inc.

<u>Chad A. Readler</u>, <u>Jeanne E. Davidson</u>, <u>Tara K. Hogan</u>, and <u>Justin R. Miller</u>, International Trade Field Office, U.S. Department of Justice, of New York, NY. Of counsel on the brief was <u>Paul Keith</u>, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

<u>Timothy Brightbill</u>, <u>Laura El-Sabaawi</u>, and <u>Usha Neelakantan</u>, Wiley Rein, LLP, of Washington, D.C., for Defendant-Intervenor SolarWorld Americas, Inc.

**Restani, Judge**: In this action challenging a final determination issued by the United States Department of Commerce ("Commerce") in Commerce's Third Administrative Review of the countervailing duty order on crystalline silicon photovoltaic cells, whether or not assembled into modules ("solar cells") from the People's Republic of China ("PRC"), covering the period from January 1, 2014, through December 31, 2014.  See <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review; 2014</u>, 82 Fed. Reg. 32, 678 (Dep't Commerce July 17, 2017) ("<u>Final Results</u>"), amended by <u>Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into</u>

Modules, From the People's Republic of China: Final Results of Countervailing Duty

Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review;

2014, 82 Fed. Reg. 46,760 (Dep't Commerce Oct. 6, 2017) ("Amended Final Results"),

Changzhou Trina Solar Energy Co., Ltd., Trina Solar (Changzhou) Science & Technology Co.,

Ltd. (collectively, "Trina"), Consolidated Plaintiffs BYD (Shangluo) Industrial Co., Ltd.

("Shangluo BYD") and Shanghai BYD Co., Ltd. ("Shanghai BYD") (collectively, "BYD"); and

Canadian Solar Inc., Canadian Solar International, Ltd., Canadian Solar Manufacturing

(Changshu), Inc., Canadian Solar Manufacturing (Luoyang), Inc., Canadian Solar (USA) Inc.,

CSI Cells Co., Ltd., CSI Solar Power (China) Inc., CSI Solartronics (Changshu) Co., Ltd., CSI

Solar Technologies Inc., and CSI Solar Manufacture Inc. (collectively, "Canadian Solar")

request the court hold aspects of Commerce's final determination to be unsupported by

substantial evidence or otherwise not in accordance with law.

    The United States ("Defendant") asks that the court sustain Commerce's Final Results of

its third administrative review.  SolarWorld Americas, Inc. ("SolarWorld") requests the court to

uphold other portions of Commerce's Final Results as supported by substantial evidence and

otherwise consistent with law and asserts that other portions are not.

## BACKGROUND

    Commerce first published a countervailing duty order on solar cells from the People's

Republic of China ("PRC") on December 7, 2012.  See Crystalline Silicon Photovoltaic Cells,

Whether or Not Assembled Into Modules, From the People's Republic of China: Countervailing

Duty Order, 77 Fed. Reg. 73,017 (Dep't Commerce Dec. 7, 2012).  In 2016, Commerce initiated

its third administrative review of this countervailing duty, covering the period from January 1,

2014 to December 31, 2014.  Canadian Solar and Trina were selected as mandatory respondents ("Respondents") and issued questionnaires along with the Government of the PRC ("GOC"). See Decision Memorandum for Final Results and Partial Rescission of Countervailing Duty Administrative Review: Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; 2014, 1 (Dep't Commerce July 10, 2017) ("I&D Memo").  On January 9, 2017, Commerce published its preliminary results of the administrative review.  Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China, 82 Fed. Reg. 2,317 (Dep't Commerce Jan. 9, 2017) (Prelim. Results) and accompanying issues and decision memorandum (Prelim. I&D Memo).  After receiving submissions from interested parties, Commerce issued its Final Results on July 17, 2017, later amended on October 6, 2017. 82 Fed. Reg. 32,678[1]; Amended Final Results, 82 Fed. Reg. 46,760.  The Amended Final Results calculated a subsidy rate of 18.16 ad valorem for Canadian Solar, 17.14 percent ad valorem for Trina, and 17.49 ad valorem for non-selected companies under review.  82 Fed. Reg. at 46,761. Plaintiff and Plaintiff-Intervenors challenge

---

[1] The Final Results were amended in order to correct ministerial errors in calculating the benefit Canadian Solar received from the "Preferential Policy Lending Program" and in "calculating the inland freight values."  See Amended Final Results, 82 Fed. Reg. at 46,761.  The corrected error resulted in a smaller subsidy rate for Canadian Solar and the subsidy rates for seventeen additional companies.  Id. No party has raised any issue with this aspect of the Amended Final Results.

several aspects of the Final Results, as amended.[2]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)

(2012).  Commerce's results in a countervailing duty proceeding are upheld unless "unsupported

by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. §

1516a(b)(1)(B)(i).

## DISCUSSION

Because the parties present a variety of fact-specific claims, the following opinion

addresses the factual background for each in turn.  Each section notes which parties are bringing

a given claim.

**I.   Export Buyer's Credit Program**

      **a.   Commerce's decision to apply adverse facts available to cooperating parties**

            **i.   Background**

In the course of the third administrative review, Commerce requested information about

the Exports Buyer's Credit Program ("EBCP') from the GOC. Canadian Solar, and Trina. See

---

[2]  Consolidated Plaintiffs BYD (Shangluo) Industrial Co., Ltd. and Shanghai BYD Co., Ltd.
("Shanglou") largely do not present their own arguments but "instead hereby support[],
incorporate[], and adopt[] by reference" all of Canadian Solar and Trina's arguments "to the
extent they challenge the rates" that they received from Commerce. Memorandum in Support of
Rule 56.2 Motion for Shanglou, Doc. No. 45-1, at 10 (Feb. 21, 2018).  The court notes their
support for Plaintiff and Plaintiff-Intervenor's challenges and will not indicate it further.

<u>Prelim I&D</u> at 2–3.[3]  The latter two submitted affiliate and customer certifications of non-use

applicable to the period of review stating that U.S.-based customers had not benefitted from the

EBCP.  <u>See</u> Trina Section III Questionnaire Response at 75, P.D. 81–98 (May 3, 2016); Trina

Benchmark Submission (BPI Version) at Ex. 10., C.D. 105–107 (Nov. 30, 2016); Canadian Solar

Section III Questionnaire Response at Vol. II, Ex. 20, P.D. 116–22, C.D. 31–37 (June 10, 2016).

The GOC, however, refused to provide information on potential third-party bank involvement in

the EBCP,[4] arguing that such information was irrelevant to Commerce's determination regarding

whether the program had been used by the relevant parties. <u>I&D Memo</u> at 13.

     Unlike in the second administrative review,[5] in which Commerce declined to apply an

adverse inference with regard to facts otherwise available ("AFA") against otherwise

cooperating respondents based on the GOC's refusal to provide requested EBCP information,

---

[3] The U.S. government imposes duties on imports when a government or public entity is found to be providing a countervailable subsidy for the manufacture, production, or exportation of the merchandise imported into the United States, if the class of goods subsidized either materially injures or threatens to materially injure an industry in the United States. <u>See</u> 19 U.S.C. § 1671(a).

[4] Trina submitted certifications of non-use for its sole U.S. customer, TUS, whereas Canadian Solar submitted certifications for most of the sales of relevant merchandise–[[ ]]. <u>See</u> Memorandum in Support of Motion of Trina for Judgment Upon the Agency Record, Doc. No. 46-3 at 9 (Feb. 21, 2018) ("Trina Br."); Memorandum of Points and Authorities in Support of Rule 56.2 Motion for Judgment on the Agency Record by Canadian Solar, Doc. No. 43-1 at 10 (Feb. 21, 2018) ("Canadian Solar Br."). Although Canadian Solar did not submit certifications for all of its U.S. customers, Commerce did not address this during the administrative review. <u>See</u> Defendant's Supplemental Brief Regarding the Application of Adverse Facts Available to the <u>Export Buyer's Credit Program</u>, Doc. No. 90 at 5 (Nov. 2, 2018) ("Def. Supp. Br.").

[5] The court upheld Commerce's decision to not apply AFA to cooperating parties when they submitted verifications of non-use in the second administrative review. <u>See</u> <u>Changzhou Trina Solar Energy Co., Ltd. v. United States</u>, 255 F. Supp. 3d 1312, 1318–19 (CIT 2017).

Commerce here concluded that the intervening 2013 revisions[6] to the EBCP made Respondents'

certifications of non-use insufficient to establish non-use. See I&D Memo at 13; Prelim. I&D

Memo at 30–31.  The 2013 change to the program allowed for the involvement of third party

banks in the EBCP and Commerce reasoned that, given the GOC's refusal to answer questions

regarding whether and how these banks extended credit, it was impossible to verify

Respondents' certifications of non-use. See I&D Memo at 13.  Commerce found that "[a]bsent

the requested information, the GOC's claims that the respondent companies did not use this

program [were] not reliable" and therefore applied AFA to all parties in calculating the amount

of subsidization based on the EBCP. Id.

Trina and Canadian Solar argue that Commerce disregarded record evidence showing

that they did not receive support from the EBCP. Trina Compl. at ¶ 10; Trina Br. at 7–9;

Canadian Solar Br. at 8–14.  Canadian Solar further argued that it was improper to use AFA

against a cooperating party and that Commerce's decision is arbitrary as it contradicts

Commerce's previous rulings in similar situations.  Canadian Solar Br. at 9, 12–13.  Trina

disputes Commerce's assertion that the non-use of third party banks was unverifiable and

contends that Commerce could have requested further documentation on Trina's loans in order to

verify non-use. Trina Br. at 14; Reply Brief of Plaintiffs Changzhou Trina Solar Energy Co., and

Trina Solar (Changzhou) Science and Technology Co., Doc No. 79 ("Trina Reply Br.") at 11–13

---

[6] Commerce identified two potential changes to the program in 2013.  First, prior to the 2013
changes, the program was only available to those with contracts over two million U.S. dollars
and Commerce noted that information on the record indicated that this requirement was
eliminated. Prelim. I&D Memo at 30. Second, information on the record indicated that China Ex-
Im bank may be distributing credits through third-party banks. Id.; I&D Memo at 13. Commerce,

(Sept. 21, 2018).  Canadian Solar argues that the affidavits of non-use were sufficient and no

other documentation was necessary. Canadian Solar Br. at 10–12. Defendant claims that

Commerce was correct in finding that respondents used the EBCP based on an adverse inference

given the GOC's failure to cooperate fully, and that Commerce was under no obligation to

attempt to verify Canadian Solar or Trina's submissions. Def. Br. at 10–20.

### ii.  Discussion

When an interested party "withholds information that has been requested" by Commerce,

Commerce may need to "use the facts otherwise available" to reach a decision.  19 U.S.C. §

1677e(a)(2)(A).  Under 19 U.S.C. § 1677e(b) an adverse inference as to what such facts show

may be used only if a party has failed to cooperate to the best of its ability, meaning that a party

has failed to "put forth its maximum effort to provide Commerce with full and complete answers

to all inquiries in an investigation."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382

(Fed. Cir. 2003).  As the court has previously held in a similar case, if a foreign government fails

to cooperate in a countervailing duty case, Commerce may apply AFA even if the collateral

effect is to "adversely impact a cooperating party."  Archer Daniels Midland Co. v. United

States, 917 F. Supp. 2d 1331, 1342 (CIT 2013). Commerce, however, should "seek to avoid such

impact if relevant information exists elsewhere on the record."  Id.

The court recently issued two opinions regarding the Export Buyer's Credit Program

Changzhou Trina Solar Energy Co. v. United States, 195 F. Supp. 3d 1334 (CIT 2016)

("Changzhou I") and Guizhou Tyre Co. v. United States, Slip Op. 18-140, 2018 WL 5307676

---

however, appears to have relied only on the potential involvement of third-party banks in
deciding that the certifications of non-use were unverifiable. See I&D Memo at 13–16.

(CIT Oct. 17, 2018) that at least facially seem to conflict. In Changzhou I, the court upheld

Commerce's use of AFA in determining that respondents used the program. 195 F. Supp. 3d at

1355. The court based its decision on Commerce's reasonable explanation that an understanding

of how an exporter would be involved in the program was necessary to determine usage and that

the GOC failed to cooperate in providing this information. Id. In contrast, in Guizhou the court

found Commerce's explanation regarding the use of the EBCP by respondents unavailing. Slip

2018 WL 5307676, at *4. In that case, Commerce found non-use submissions by respondents

unverifiable because the GOC refused to provide documents regarding the functioning of the

EBCP under the GOC's new regulations.[7] Id. The court found that Commerce failed to show

there was a gap in the record warranting the use of AFA and that Commerce was "conflat[ing]

the program's operation with its use," and thus remanded for reconsideration. Id. at *4, *12.

Although both opinions share some factual similarities to this case, neither is fully dispositive

given the record before the court.

    In Changzhou I, unlike here, the respondents did not submit customer certifications of

non-use, so that issue was not before the court. See Countervailing Duty Investigation of Certain

Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final

Affirmative Countervailing Duty Determination, 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23,

2014), accompanying Issues and Decision Memorandum at 93 ("Changzhou I I&D Memo").  In

addition to the lack of complete documentation of non-use, in that review Commerce supplied

---

[7] Similarly, given the 2013 changes regarding the involvement of third-party banks to the EBCP,
however, Commerce claims here that the GOC failed to provide information "critical to
understanding how Export Buyer's Credits flow to/from foreign buyers and the China Ex-Im
Bank." Prelim. I&D Memo at 31.

detailed reasoning for why documentation from the GOC was necessary. <u>Changzhou I I&D</u>

<u>Memo</u> at 91–94. Here, Commerce provided reasoning as to why the GOC's failure to respond

adequately made it impossible for it to understand fully the operation of the EBCP, but it failed

to show why a full understanding of the EBCP's operation was necessary to verify non-use

certifications.

       In <u>Guizhou</u>, as here, Commerce found that the GOC's refusal to explain if and how third-

party banks were involved in the EBCP made respondent's claims of non-use unverifiable.

<u>Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results</u>

<u>of Countervailing Duty Administrative Review; 2014</u>, 82 Fed. Reg. 18,285 (Dep't Commerce

Apr. 18, 2017) accompanying Issues and Decision Memorandum at 23–24 ("<u>Guizhou I&D</u>

<u>Memo</u>"). In the <u>Guizhou</u> court's review of that determination, it found that the GOC's lack of

response was "rendered immaterial by responses from [respondents]." 2018 WL 5307676, at * 3.

The court here does not resolve the materiality issue at this juncture, rather it finds that

Commerce simply failed to provide reasoning sufficient for this court to find that its

determination was supported by substantial evidence. In this case, Commerce claims its ability to

verify the certifications was stymied by a lack of understanding of if and how third party banks

were involved in the distribution of loans. <u>I&D Memo</u> at 13. Commerce, however, did not

explain why the GOC's failure to explain this program was necessary to assess claims of non-use

and why other information accessible to respondents was insufficient to fill whatever gap was

left by the GOC's refusal to provide internal bank records. Further, Commerce did not explain

how an adverse inference regarding the operation of the EBCP logically leads to a finding that

respondents used the program. The use of facts available allows Commerce to render

determinations when information is missing and it may use an adverse inference if respondents

fail to cooperate, but is not permitted to skip either of these steps on the way to use of AFA.

Under 19 U.S.C. § 1677e(b) Commerce may use AFA to choose among facts of record,

but the choice must fill in the information that is actually missing. Further, although it is true that

Commerce need not consider information submitted by respondents that cannot be verified,

Commerce must first reasonably show that such information is, in fact, unverifiable. See 19

U.S.C. § 1677m(e); see also Papierfabrik August Koehler SE v. United States, 843 F.3d 1373,

1382–83 (Fed. Cir. 2016) (holding that if the requirements of §1677m(e) are not met, Commerce

need not consider information submitted by an interested party). What type of information

requested from the GOC would have made these claims verifiable? And what information, such

as loan agreements and other relevant documents ostensibly held by Respondents, might have

sufficed to provide Commerce the assurance it needed? Commerce does not explain.

Accordingly, the court remands this matter and instructs Commerce to explain what

information specifically the GOC failed to provide that led it to resort to facts available and the

facts as to which it drew an adverse inference in arriving at the conclusion that Respondents

benefited from the EBCP. Commerce should further explain if and how certifications of non-use

are unverifiable in the absence of the GOC's cooperation. If Commerce determines that it is able

to verify non-use by not unreasonably onerous means, the court instructs it to do so.

### b.  Adverse rate selected for Export Buyer's Credit Program

#### i.  Background

If Commerce continues to find that respondents used the EBCP, and the court sustains

that determination, then the court must assess whether the rate selected for the EBCP is

supported by substantial evidence. As with several other calculation issues addressed here, in the

interest of judicial and attorney economy the court addresses this issue, which has been briefed

fully. Canadian Solar contests Commerce's calculation of an adverse rate for the program.

Canadian Solar Br. at 14–17. After finding no program identical to the EBCP in the same

administrative review, Commerce identified a similar program in the same proceeding to use as a

basis for calculating the rate for the EBCP. I&D Memo at 18–19.  Commerce calculated a rate of

5.46 percent ad valorem, for the EBCP by utilizing the rate "calculated for company respondent

Lightway Green New Energy Co., Ltd.'s usage of the Preferential Policy Lending to the

Renewable Energy Industry program in the 2012 administrative review of this proceeding."

Prelim I&D Memo at 32.  Commerce explained that the Lightway Green New Energy Co.

Policing Lending Program ("Lightway Program") was similar because both it and the Export

Buyer's Credit Program provided access to loans.  I&D Memo at 19.

        Canadian Solar challenges the use of the Lightway Program rate, arguing that it is not an

appropriately similar program.  Canadian Solar Br. at 15. China's Ex-Im Bank is the

administrator of the EBCP, a program that provides credit to foreign importers of Chinese

products and loans. See I&D Memo at 12–13. Canadian Solar argues the record contains

evidence of a more similar program, the Export Seller's Credit Program, which provides a more

directly comparable rate than the Lightway Program.  Canadian Solar Br. at 15–17. Canadian

Solar argues that the Lightway Program is not a similar program in that, although it calls for

financial institutions to offer loans to renewable energy, these loans are not specifically related to

exports.  Canadian Br at 16. They argue that Commerce should have further explained why it

chose the Lightway Program over the Export Seller's Credit Program.  Canadian Solar Br. at 15,

17. The Defendant argues that Commerce acted in accordance with its established practice in

selecting the Lightway Program. Def. Br. at 21–24.

## ii. Discussion

Commerce has discretion when calculating the appropriate AFA rate, as neither the

relevant statute nor regulations limit how Commerce must select programs that are "similar," or

if no similar program exists, one "from a proceeding that the administrating authority considers

reasonable to use." 19 U.S.C. § 1677e(d)(1); see Solar Americas, Inc. v. United States, 229 F.

Supp. 3d 1362, 1366 (CIT 2017).[8]  Commerce has developed a methodology by which to

determine the appropriate AFA rate in accordance with the governing statute.  See Solar

Americas, 229 F. Supp. 3d at 1366 (describing Commerce's five-step hierarchy in selecting an

AFA rate).  First, Commerce assesses whether another cooperating company in the same

proceeding used the identical program, and if so, Commerce applies the "highest non-de

minimus rate calculated for a cooperating company for the identical program in the same

proceeding."  Id.  If no such figure exists, Commerce applies "the highest non-de minimus rate

calculated for a cooperating company for a similar program in the same proceeding."  Id.  If no

---

[8]     The section, in relevant part, reads:
        "(1) In general. If the administering authority uses an inference that is adverse to the
        interests of a party under subsection (b)(1)(A) in selecting among the facts otherwise
        available, the administering authority may--
                (A) in the case of a countervailing duty proceeding--
                        (i) use a countervailable subsidy rate applied for the same or similar
                        program in a countervailing duty proceeding involving the same country;
                        or
                        (ii) if there is no same or similar program, use a countervailable subsidy
                        rate for a subsidy program from a proceeding that the administering
                        authority considers reasonable to use; . . ." 19 U.S.C. § 1677e(d).

such figure can be calculated, then Commerce continues to step three, and if necessary, step four

and five until it arrives at the appropriate metric.  Id.[9]

   Here, Commerce was unable to satisfy step one of the methodology as there was no

alternative rate for the EBCP in the Third Administrative Review.  See Prelim. I&D Memo at

30–32; I&D Memo at 18–21.  Thus, Commerce turned to step two and found a sufficiently

similar program from an earlier administrative review, the Lightway Program. Prelim. I&D

Memo at 31–32; I&D Memo at 19.  Commerce predicated this finding of similarity on both the

EBCP's and the Lightway Program's distribution of loans.  I&D Memo at 19.  With this finding,

Commerce applied the rate from the Lightway Program to calculate an AFA rate for the EBCP.

Id.  Canadian Solar's argument that Commerce needed to compare the Lightway Program to

Canadian Solar's proffered Export Seller's Credit Program fails. See Canadian Solar Br. at 15.

Under Commerce's established methodology and consistent with the plain text of the statute,

Commerce selects a similar program, not necessarily the most similar program.  See 19 U.S.C. §

1677e(d)(1)(A)(i).  Additionally, Canadian Solar argues that Commerce failed to explain why the

Lightway Program was similar.  Canadian Solar Br. at 17; but see I&D Memo at 19 (stating that

the Lightway Program was chosen because it, like Export Buyer's Credit Program, was a loan

program).  Although a more detailed description might be helpful, it is not required.

---

[9] "In the absence of [a tier-two rate], Commerce applies the highest non-de minimis rate
calculated for a cooperating company for an identical program in a different CVD proceeding
(i.e., involving a different industry) for the same country. In the absence of such a rate,
Commerce uses the highest non-de minimis rate calculated for a cooperating company for a
similar program in a different proceeding for the same country. Finally, in the absence of such a
rate, Commerce uses the highest rate calculated for any non-company specific program from the
same country that the industry subject to the proceeding could have used." Solar Americas, 229
F. Supp. 3d at 1366 (internal citations omitted).

Commerce has broad discretion in determining and applying an AFA rate, so long as it

"reasonably balance[s] the objectives of inducing compliance and determining an accurate rate."

Solarworld Americas, 229 F. Supp. 3d at 1366.  Commerce used its developed methodology to

arrive at the AFA rate of 5.46 percent. The court finds no error in this regard.

## II.      Provision of Aluminum for LTAR

### a.   Specificity determination of aluminum program

#### i.   Background

Canadian Solar claims that the provision of aluminum extrusions for less than adequate

remuneration (LTAR) is not properly classified as a specific subsidy.  Canadian Solar Br. at 26.

Commerce found, as it did in the second administrative review, that the provision of aluminum

extrusions for less than adequate remuneration was a de facto specific subsidy because the

industries that used aluminum extrusions were "limited in number" and no new information

disturbed that finding.  I&D Memo at 22.[10]  Both Commerce and Canadian Solar agree that the

six categories of industries that use aluminum extrusions are: "(1) building and construction, (2)

transportation, (3) electrical, (4) machinery and equipment, (5) consumer durables, and (6) other

industries."  I&D Memo at 21; Canadian Solar Br. at 27.

Canadian Solar argues that the named industries listed as using aluminum extrusions are

themselves diverse and also that Commerce failed to inquire as to whether the number of

industries in the "other industries" category would render the subsidy non-specific.  Canadian

---

[10] Neither the preliminary nor the final issues and decision memorandum for this administrative
review indicate whether Commerce drew an adverse inference regarding specificity from a
failure of the GOC to fully respond to its questionnaire. Rather, the justification given seems to
rely on unspecified reasoning provided in a previous decision. I&D Memo at 21–22.

Solar Br. at 26–27. According to Canadian Solar, Commerce was obligated to conduct a more

searching analysis regarding the diversity of these industries as the industries identified are broad

categories that contain numerous sub-industries.  Id. at 27–28.   SolarWorld argues that the

catchall "other industries" by itself does not mean the subsidy was widely used by numerous

other industries and that Canadian Solar's relies on outdated case law. SolarWorld's Response to

Plaintiff's Rule 56.2 Motion for Judgment upon the Agency Record, Doc. No. 69 at 27–28 (July

20, 2018) ("SolarWorld Resp."). The Government responds that the information received from

GOC shows that the "recipients of aluminum extrusions (on an industry basis) are limited in

number." Def. Br. at 25.

### ii.  Discussion

Commerce is empowered to assess countervailing duties if, after investigating a subsidy,

it finds that the subsidy "1) provides a financial contribution to a person, 2) a benefit is thereby

conferred, and 3) the subsidy is specific."  Bethlehem Steel Corp. v. United States, 223 F. Supp.

2d 1372, 1378 (CIT 2002); see also 19 U.S.C. § 1677(5). No party challenges Commerce's

determinations regarding financial contribution or benefit conferred. Domestic subsidies are

specific, and thus countervailable, when"[t]he actual recipients of the subsidy, whether

considered on an enterprise or industry basis, are limited in number." 19 U.S.C. §

1677(5A)(D)(iii)(I).[11]  In determining whether a subsidy is provided to a group of enterprises or

---

[11] The relevant statute section on subsidy specificity reads:
> "(iii) Where there are reasons to believe that a subsidy may be specific as a matter of fact,
> the subsidy is specific if one or more of the following factors exist:
>> (I)    The actual recipients of the subsidy, whether considered on an enterprise
>>        or industry basis, are limited in number." 19 U.S.C. § 1677(5A)(D)(iii).

industries, Commerce is not required to "determine whether there are shared characteristics

among the enterprises or industries" that receive or are eligible for a subsidy: variety amongst the

industries receiving a given subsidy is not the test for specificity.  19 C.F.R. § 351.502(b). That

being said, Commerce is under an obligation to compare the industries receiving the subsidy to

the industry makeup of the country at issue as a whole. This is a necessary step in the analysis in

order to "avoid the imposition of countervailing duties in situations where, because of the

widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an

economy." Uruguay Round Agreements Act, Statement of Administrative Action, H.R.Rep. No.

103-316, vol. 1, at 930–31 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4242 ("SAA").[12]  By

way of analogy, if the GOC had instead said that only two sectors used aluminum extrusions –

manufacturing and non-manufacturing – on a shallow level that would seem to satisfy the

requirement that the subsidy be available to only a limited number of industries, but in reality

such a distribution is not specific as those two categories encompass all possible industries.

     Thus, although Commerce was under no obligation pursuant to its regulations to compare

the characteristics of the six industries listed by the GOC against one another, Commerce should

have determined whether these six industries made up a significant enough portion of all Chinese

industries to render the subsidy nonspecific despite the use of only six categories to describe

---

[12] See 19 U.S.C. § 3512(d), which reads "[t]he statement of administrative action approved by
the Congress under section 3511(a) of this title shall be regarded as an authoritative expression
by the United States concerning the interpretation and application of the Uruguay Round
Agreements and this Act in any judicial proceeding in which a question arises concerning such
interpretation or application."

these industries.[13] The categories mentioned here – building and construction; transportation;

electrical; machinery and equipment; consumer durables; and other industries[14]– appear to

represent a large swath of industries that could be further broken down into numerous sub-

industries.[15] Commerce needed to explain how subsidizing these broad industries amounts to a

specific rather than a generally available subsidy. It is nonsensical to simply count the number of

proffered industries, regardless of their composition, in order to determine specificity. Such a

cursory test would allow gamesmanship in specificity determinations by allowing a respondent

to simply recharacterize what is in fact a limited number of industries as numerous industries in

order to avoid such a finding.

---

[13] SolarWorld apparently argues that the six industries Commerce continually references is a
characterization created by China to describe their own industry makeup. See SolarWorld Resp.
at 3. The court notes that these categories instead appear to be used by the U.S.-based
international organization the Aluminum Extruders Council in its analysis of North American
consumption of aluminum extrusions. See Letter from Grunfeld Desiderio Lebowitz Silverman
& Klestadt LLP, to Sec'y Commerce, re: GOC Initial CVD Questionnaire Response re Canadian
Solar, at 45-46, C.R. 38-72, 78-82, 85, P.R. 123-127, Ex. 6 (June 10, 2016). It is unclear from the
record before the court whether the GOC provided these categories as a description of their own
industries or provided them as a comparative for industry usage in the United States.

[14] In the preliminary issues and decision memorandum Commerce reasoned that "[a]lthough the
GOC claims its information indicates aluminum extrusions are used in a variety of industries and
sectors across the PRC, the industries within those sectors that actually consume aluminum
extrusions are limited in number." Prelim I&D at 37. It is unclear from context to what
Commerce is referring with "sectors," and the Government did not clarify in its briefs or during
oral argument. It is possible, that Commerce was trying to say that these six categories may be
diverse, but the actual users within these six categories are limited, thus resulting in a specific
subsidy. If this is the case, Commerce must further explicate and provide support for such
reasoning.

[15] The parties have been unclear about the differences between the record in this case and in
Changzhou Trina Solar Energy Co., Ltd. v. United States, 195 F. Supp. 3d 1334 (CIT 2016).
Thus, it is not clear that it conflicts with the court's approach here. To the extent it may conflict,
the court declines to follow it at this stage.

The court renders no decision on whether the provision of aluminum in the GOC is, in fact, a countervailable subsidy, but remands for Commerce to reconsider its methodology in arriving at this conclusion.

### b.  Challenge to Commerce's use of Comtrade and IHS datasets

#### i.  Background

If, on remand, Commerce continues to find that the provision of aluminum amounts to a countervailable subsidy, it must additionally reconsider the data used to arrive at the appropriate benchmark.  Canadian Solar and Trina challenge Commerce's decision to average data from IHS technology ("IHS") and UN Comtrade ("Comtrade") to determine the appropriate aluminum extrusion benchmark.

They contend that whereas IHS data specifically pertains to aluminum frames for solar modules, the type used by Trina and Canadian Solar, Comtrade data is broader and encompasses multiple broad Harmonized Tariff Schedule ("HTS") subheadings at the six-digit level (7604.21, 7604.29, and 7610.10)[16] which covers many products not used by Respondents.  Trina Br. at 15; Canadian Solar Br. at 29–31.  Trina and Canadian Solar argue that the annual average figure provided by IHS provides a more accurate benchmark for the POR because it pertains specifically to aluminum used in the production of solar panels, and thus accords with Commerce's preference for the "narrowest category of products encompassing the input product."  Trina Br. at 17; see also Canadian Solar at 29–31.  Trina further argues that even if

---

[16] "7604.21 (*i.e.*, aluminum alloy hollow profiles), 7604.29 (*i.e.*, aluminum alloy profiles other than hollow profiles), 7610.10 (*i.e.*, aluminum door, windows and their frames and thresholds for doors)." Harmonized Tariff Schedule of the United States (2014) ("HTSUS").

Commerce's normal preference for monthly average has merit, there is no way for Commerce to know whether Comtrade's monthly data more accurately reflects price fluctuations over time, because those fluctuations may very well be caused by the irrelevant merchandise within the HTS subheadings.  Trina Br. at 19.

SolarWorld counters that the inclusion of Comtrade data is necessary, given Commerce's preference for monthly over annual data in setting benchmark prices.  SolarWorld Resp. at 31. SolarWorld argues that monthly data allows Commerce to match subsidy program pricing with world benchmark prices more accurately.  Id.  The Government argues that given the noncritical flaws in both datasets, averaging them was the appropriate course of action. Def. Br. at 26–31.

## ii.  Discussion

When goods are provided for LTAR, Commerce determines the amount of the subsidy by comparing remuneration actually paid with adequate remuneration.  See 19 U.S.C. § 1677 (5)(E)(iv).  Commerce employs a three-tiered hierarchy to determine the appropriate remuneration benchmark.  In the absence of an undistorted tier one benchmark, e.g., an "actual transaction [price] in the country in question," Commerce turns to a tier two benchmark, e.g., a "world market price" for goods in question.  C.F.R. § 351.511(a)(2); see also Essar Steel Ltd. v. United States, 678 F.3d 1268, 1273 (Fed. Cir. 2012).  When there is more than one dataset representing the world market price, then "the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability."  19 C.F.R. §

351.511(a)(2)(ii).[17]

In this instance, Commerce combined two datasets, IHS Technology and UN Comtrade, the latter of which uses broad HTS categories. Balancing Commerce's preference for monthly data and its desire for data specific to the relevant input, Commerce averaged these two datasets. But, in doing so, Commerce failed to properly make allowance for "factors affecting comparability." See 19 C.F.R. § 351.511(a)(2)(ii).

Commerce prefers monthly data points ostensibly to track potential market fluctuations over the period of review or investigation,[18] but there is no statutory or regulatory basis for allowing this preference to overcome vital comparability concerns. This preference does not allow Commerce to include largely irrelevant data in its average of world market data sets. Put simply, not all flaws in data are equally problematic. Although some degree of nonspecificity is tolerable, when a dataset is vastly overinclusive of products not covered by the relevant CVD order, that flaw is not equivalent to the flaw in otherwise product-specific arising from its annual average. Here, Commerce made little effort to counter claims that Comtrade data was based on too broad a product category to provide an accurate world market price, stating only that Commerce was familiar with the data and that the HTS descriptions were suitable for constructing a world price for aluminum extrusions. I&D Memo at 23–24. Although Commerce

---

[17] A tier-two benchmark is one that measures "the adequacy of remuneration by comparing the government price to a world market price where it is reasonable to conclude that such price would be available to the purchasers in the country in question." 19 C.F.R. § 351.511(a)(2)(ii).

[18] Commerce has not been clear about how it uses information about monthly fluctuations, e.g., is there a monthly comparison between purchase price and benchmark price, are aberrant months rejected, or is synchronization with the period of review the purpose?

often has to use less than ideal data, here it has the option to use only seemingly product-specific data.

Thus, the court concludes that Commerce's decision to average the Comtrade and IHS datasets without properly considering whether the Comtrade data was too flawed to be probative of the world market price for the input at issue renders the decision unsupported by substantial evidence. Accordingly, the court remands this case to Commerce with instructions either to use solely the IHS dataset in its calculation of the appropriate benchmark or else explain why the inclusion of the Comtrade data does not produce a fatally inaccurate result.

## III.    Provision of Solar Glass for LTAR

### a.  Background

Canadian Solar and Trina similarly challenge Commerce's benchmark determination with regard to solar glass. Commerce found the GOC's solar glass market distorted, and so used world market indicators to calculate a benchmark for adequate remuneration. I&D Memo at 29. In its final calculation, Commerce averaged monthly data points from Comtrade[19] with annually-reported data from IHS. I&D Memo at 29–30. Commerce defends this amalgam arguing that, although neither set was perfect, neither was so deficient as to merit rejection. Def. Br. at 31–36. Like the data used in setting the benchmark for aluminum extrusions, the Comtrade data in question contains monthly data points, but is less specific to solar glass, whereas the IHS data is an average annual figure, but one specific to solar glass. Id. at 32.

Canadian Solar and Trina contend that Commerce should not include the Comtrade data

---

[19] Comtrade's dataset is not exclusive to solar glass, but the data used was limited to countries that produce solar glass. Prelim. I&D Memo at 19.

due to a critical lack of product specificity.  Canadian Solar Br. at 21–23; Trina Br. at 22–23.

They argue that Commerce should use only the IHS data given that its specificity to solar glass,

whereas the Comtrade data includes HTS headings that include, but are not limited to, solar

glass.   Canadian Solar Br. at 17–19, see also Trina Br. at 20–23. They argue the glass included

in these headings often does not possess the specific characteristics necessary for use in solar

cells.[20]

Further, Canadian Solar argues that Comtrade's monthly benchmarks project a distorted

picture of the solar market, showing price variability unsupported by the record and disputed by

party submissions.[21]  See Canadian Solar Br. at 19–20. Canadian Solar acknowledges that

including only Comtrade data from solar glass-producing nations makes the data less-flawed, but

they further note that the Comtrade data does not contain data from certain major solar glass

producing countries, including the United States, which is one of the top three solar glass

producing countries globally.  Canadian Solar Br. at 22–23.  Finally, Trina contends that

although the record indicates that there is a difference between broadly-defined tempered glass

and the more specific solar glass, Commerce depended on the description of the headings

referencing tempered glass as justification for its position that the headings included solar glass.

Trina Br. at 23.

SolarWorld disagrees.  It argues that the inclusion of the Comtrade data was correct given

---

[20] Trina argues that there is a substantial difference between solar glass and tempered glass. For instance, whereas solar glass has little variability in thickness [[ ]], the glass in the HTS headings used in Comtrade's dataset is not similarly restricted to glass falling into narrow thickness parameters. Trina Br. 22. Further, solar glass requires a low [[ ]] which is not accounted for in the Comtrade data. Trina Br. at 20.

Commerce's established preference for using monthly over annual data.  SolarWorld Resp. at

33–34.  It asserts that monthly-reported data better accounts for market fluctuations.  Id.

Canadian Solar responds that although monthly data points are preferable when available, there

is no statutory requirement mandating that Commerce use monthly rather than annual data and

contend that the use of IHS data is supported by the record.  Canadian Solar Reply Brief in

Support of Canadian Solar's Rule 56.2 Motion for Judgment upon the Agency Record, Doc. No.

80 at 10–11 (Sept. 21, 2018) ("Canadian Solar Reply"); Reply Brief of Trina, Doc. No. 79 at 8–

10 (Sept. 21, 2018) ("Trina Reply").

>    **b.  Discussion**

As with the above discussion of the proper datasets for calculating a benchmark for

aluminum extrusions, Commerce similarly calculated its solar glass benchmark by averaging two

tier-two datasets.  Also as with the aluminum extrusions data, Commerce did not sufficiently

determine the adequacy of these datasets or explicate their comparability.

Solar glass is a type of flat glass, which in turn is one of the [[ ]] main types of glass on

the global market. Letter on Behalf of Canadian Solar to the Dep't Commerce re: Benchmark

Submission at Ex. 5 C.R. 101–102 (No. 30, 2016).  Flat glass represents about [[ ]]% of the

global glass market, but of that [[ ]]% less than [[ ]]% is solar photovoltaics.  Id.  Thus the vast

majority of flat glass is not suitable for solar panels, but is used in the production of other

merchandise such as windows, glass doors, windshields, etc. See id.  Comtrade data includes

---

[21] See [[ ]]. Canadian Solar Br. at 20.

glass under the six-digit HTS headings 7007.19and 7007.29.[22] Neither of these HTS basket

headings are specific to solar glass, but rather includes many types of safety glass (often a type of

flat glass) unrelated to solar glass.  Id.  In contrast, the IHS data is specific to solar glass.  Prelim.

I&D Memo at 19.

  In its brief, Defendant cited the court's earlier decision in Changzhou Trina Solar Energy

Co., Ltd., v. United States, regarding the averaging of IHS data and Global Trade Atlas (GTA)

data in a prior administrative review to arrive at the proper benchmark for solar glass. Slip. Op.

18-31, 2018 WL 1649629 (CIT Mar. 27, 2018) ("Changzhou II"); Def. Resp. Br. at 28. In that

case, the court upheld Commerce's decision on remand to average IHS and GTA to arrive at a

benchmark price for solar glass for reasons similar to those given in this case. See Changzhou II,

2018 WL 1649629 at *7. The court notes that plaintiffs challenge the use of the Comtrade data in

this case, but there was no challenge to the use of GTA data in the previous case, and thus the

court had neither the appropriate record nor any reason to inspect the adequacy of the GTA data.

Id. at *6. Thus, the court finds the previous decision unhelpful.

  Finally, the court finds Commerce's reliance on potential price fluctuations in the solar

glass industry as a reason for including the Comtrade data unpersuasive. The only indication on

the record before the court showing price fluctuations in solar glass is from the Comtrade data

itself. In contrast, submissions by respondents during the administrative review show minimal

solar glass price fluctuations. Canadian Solar Br. at 19–20. Commerce did not inquire into

---

[22] Heading 7007 contains "Safety glass, consisting of toughened (tempered) or laminated glass."
7007.19 contains "toughened (tempered) safety glass: other." 7007.29 contains "[l]aminated
safety glass: other."  The other in both cases referring to "[of] size and shape suitable for
incorporation in vehicles, aircraft, spacecraft or vessels." HTSUS (2014).

whether the fluctuations in the Comtrade data were due to solar glass rather than other

merchandise contained in the HTS headings. Without answering that threshold question, the

court cannot be certain that the addition of the Comtrade data does not create the appearance of

fluctuations in the solar glass market were none actually exist. Accordingly, the court cannot

assess whether the inclusion of the Comtrade data makes the resulting benchmark more or less

reliable.

      Although averaging datasets is appropriate in certain circumstances, when one dataset is

far more specific to the product at issue, that data may be more probative even if it is based on a

yearly average rather than a monthly one.  See 19 C.F.R. § 351.511(a)(2)(ii) (requiring the

department to take into account "factors affecting comparability").   As with the datasets used to

calculate the aluminum extrusions rate, Commerce failed to adequately evaluate and explain the

relative adequacy and comparability of both datasets.[23]  Although Commerce may prefer to

employ monthly data in its analysis, this cannot supersede regulatory considerations requiring

the use of adequate data  Here, Commerce failed to meaningfully assess the reliability of the

Comtrade data and included it despite indications that it is overinclusive in regards to the types

of glass included in the data, underinclusive in failing to include solar glass-producing countries,

and by failing to assess whether the monthly fluctuations were due to price variability of solar

glass or merely related to other merchandise contained in the HTS headings at issue.

      In finding the Comtrade data to be a sufficient world market price metric without

adequate evaluation, Commerce made a decision unsupported by substantial evidence or

---

[23] As with aluminum extrusions, it is unclear how Commerce utilizes monthly fluctuation data.

otherwise not in accordance with law.  On remand, Commerce is instructed to use the IHS data

alone in constructing a benchmark for the world market price for solar glass and otherwise

address the court's concerns as to the Comtrade data and explain why its inclusion is appropriate.

## IV.   Provision of Polysilicon for LTAR

### a.  Background

In its original investigation, Commerce determined that the provision of polysilicon at LTAR

in the PRC was a countervailable subsidy based on AFA. Prelim. I&D Memo at 33–35.

Commerce determined that a benefit was being conferred based on the provision of polysilicon

for LTAR, and thus sought to determine adequate remuneration in order to assess the appropriate

countervailing duty.[24] Id. at 34, I&D Memo at 31.

It is Commerce's practice to determine remuneration by comparing the government price

to a "market-determined price for the good or service resulting from actual transactions in the

country in question," which it refers to as a tier-one metric. See 19 C.F.R. § 351.511(a)(2)(i).[25]

---

[24] In this review, the GOC indicated that certain producers of solar grade polysilicon were majority-owned by the government, so Commerce found that they "constitute[d] 'authorities' within the meaning of section 771(5)(B) of the Act" and when the producers were foreign-owned that evidence on the record showed that these produces were "vested with governmental authority." Prelim. I&D Memo at 33. The finding that the producers were "authorities" within the meaning of the Act was in part based on AFA due to the GOC's failure to respond adequately to numerous questions. See id. at 22–25 (detailing findings based on AFA). Commerce found that a "benefit [was] being conferred because the polysilicon [was] being provided for LTAR." Id. at 34. Because the GOC refused to provide information on the industries consuming polysilicon, Commerce relied on the GOC's statement from a prior review in determining that the subsidy was "limited to specific industries within the meaning of section 771(5A)(D)(iii) of the Act, namely, the solar and semiconductor industries." Id.

[25] Tier-one metrics "could include prices stemming from actual transactions between private parties, actual imports, or, in certain circumstances, actual sales from competitively run government auctions." 19 C.F.R. § 351.511(a)(2)(i); See I&D Memo at 31.

When no such price is available, or when there is reason to conclude that actual transactions are

distorted, then Commerce resorts to its tier-two metric and determines adequate remuneration by

comparing the government price to a world market price if it is reasonable to assume purchasers

in the relevant country would be able to access that price. See 19 C.F.R. § 351.511(a)(2)(ii);

Countervailing Duties: Final Rule 63 Fed. Reg. 65,348, 65,377 (Dep't Commerce Nov. 25, 2018)

("Preamble"). Because Commerce found that the PRC's involvement in the polysilicon market

distorted the domestic prices, Commerce resorted to tier-two world market price data in order to

determine the appropriate polysilicon subsidy benchmark.[26] I&D Memo at 31; See 19 C.F.R. §

351.511(a)(2). Commerce did not explain how the GOC's market interference would result in

import distortion.

  Canadian Solar challenges this determination, arguing that because all of its polysilicon

purchases were imported from market-economy suppliers outside the PRC, rather than

domestically-purchased, they would not be distorted by the GOC's market interference.

Canadian Solar Br. at 41–42.  Canadian Solar thus contends that Commerce should have used

Canadian Solar's purchases as a first-tier metric. Id. at 42. SolarWorld objects, arguing that

although these purchases were imports, the "third-country suppliers would be forced to lower

prices in order to compete with the artificially low prices in China."  SolarWorld Resp. at 44.

The Defendant responds that after finding that the Chinese market was distorted, it acted within

its discretion in rejecting the imports as tier-one evidence and resorting to tier-two.  Def. Br. at

37–38.

---

[26] Commerce averaged the world market solar grade polysilicon prices from Bloomberg, Energy
Trend, Greentech Media, and IHS. I&D Memo at 31.

### b.  Discussion

As mentioned above, Commerce's determination that the polysilicon program was countervailable was based on the use of AFA.  Prelim. I&D Memo at 18.  As indicated previously, when a party refuses to cooperate and withholds requested information necessary to a determination, Commerce may need to rely on "facts otherwise available" in making a determination.  19 U.S.C. § 1677e(a)(2).  Although under 19 U.S.C. § 1677e(b) Commerce may, under certain circumstances, draw an adverse inference as to facts affecting a cooperating party, it should attempt to avoid doing so when adequate information exists elsewhere on the record that would avoid this collateral effect.  Archer Daniels, 917 F. Supp. 2d 1331 at 1342; see also Fine Furniture (Shanghai) Ltd. v. United States, 865 F. Supp. 2d 1254, 1262 (CIT 2012) (holding that "[w]here the respondents have placed evidence on the record consistent with the Department's regulations for calculating benchmarks . . . Commerce would be expected to consider such evidence.").  The court in Fine Furniture also found that an "alternative benchmark meeting such criteria" that did not "adversely affect a cooperative party . . . would be superior to one which does adversely affect a cooperative party." 865 F. Supp at 1262.[27]  This policy helps ensure that non-government respondents continue to cooperate in administrative reviews and gives Commerce more opportunities to collect data that may best reflect a rate set in accordance with market principles.

Here, Canadian Solar did not take issue with Commerce's calculation of the world market price, but rather they argue that Commerce should not have resorted to this tier-two metric in the

---

[27] The non-government respondents in that case did not place on the record any alternative benchmarks consistent with 19 C.F.R. § 351.511(a)(2). See Fine Furniture, 865 F. Supp. at 1262.

first place.  Nothing in the record before the court indicates that Chinese manipulation of

domestic transactions had any effect on arms-length import prices, and without such a

determination, it is impossible to assess whether Commerce correctly resorted to a tier-two

benchmark.

Rather than address Canadian Solar's submissions, which Canadian Solar claims show

that all polysilicon purchases involved "arms-length import transactions with market economy

suppliers," Commerce dismissed the evidence without consideration, stating simply that

Commerce had already found actual transactions in China distorted.  Canadian Solar Br. at 42;

I&D Memo at 31.  This is circular.  Commerce's determination that the actual transactions were

distorted presupposed the appropriateness of applying a subsidy rate to these cooperating parties

derived from application of AFA in finding there was a subsidy program.  Simply stating that the

market was distorted fails to give cooperating parties a meaningful chance to rebut that they

benefitted from any subsidy resulting in market distortion. Commerce should have considered

Canadian Solar's proffered evidence and either accepted it as a tier-one metric or explained how

these imports may have been distorted by GOC interference in the market. Only if the latter

occurred would it be appropriate to resort to a tier-two metric. In sum, Commerce must first

explain why Canadian Solar's submission, a potential tier-one benchmark, is not usable. Such an

explanation should not be based entirely on the adverse inference used to determine that the

GOC's influence in polysilicon distorted the market. Although SolarWorld's claim regarding

import price depression in order for importers to compete in the PRC's national market may

certainly be the case, without any such determination on the record, or even sufficient

information about polysilicon's fungibility or the dynamics of the market, the court cannot

accept it.

Accordingly, with respect to Commerce's decision to resort to a tier-two benchmark with regards to polysilicon, the court finds that Commerce's decision was unsupported by substantial evidence and remands this issue. On remand Commerce should either use Canadian Solar's import data as a tier-one benchmark or else explain how the GOC's purported interference with the polysilicon market would distort arms-length import transactions in a way that makes this data unreliable.

## V.   Inclusion of International Freight Charges

### a.   Use in calculating polysilicon, aluminum, and solar glass benchmarks

#### i.   Background

In calculating the appropriate benchmark Commerce added international freight charges to the calculations for polysilicon, aluminum, and solar glass.  <u>I&D Memo</u> at 33.  Canadian Solar argues that [[ ]] Commerce should not include international freight charges. Canadian Solar Br. at 32–34. Commerce rejected this argument in its final determination.   <u>See</u> <u>I&D Memo</u> at 33. SolarWorld and the Government contend that the statute only requires that the benchmark be adjusted based on market conditions and does not concern the character of purchases by specific respondents during the period of review.  SolarWorld Resp. at 34–36; Def. Br. at 38–39.

#### ii.   Discussion

The statute at issue requires Commerce to determine a world market price based on "prevailing market conditions."  19 U.S.C. § 1677(5)(E).[28]  Commerce's regulation states that in

---

[28] The section reads, in relevant part:
     "the adequacy of remuneration shall be determined in relation to prevailing market

assessing the adequacy of remuneration with a tier-one or tier-two metric,[29] Commerce is

required to "adjust the comparison price to reflect the price that a firm actually paid or would pay

if it imported the product." 19 C.F.R. § 351.511(a)(2)(iv). The regulation explicitly includes

transportation as an input in calculating prevailing market conditions and further assumes for its

purposes that a firm imports the product at issue. Id.; see also Creswell Trading Co. v.

Allegheny Founding Co., 141 F.3d 1471, 1478 (Fed. Cir. 1998) (finding that a world market

price must include the cost of shipping). This regulation does not require Commerce to base its

decision on the purchasing decisions of the parties before it in a given proceeding, but rather

requires that Commerce calculate the market conditions based on a party's hypothetically

importing a given product. See Beijing Tianhai Industry Co., Ltd. v. United States, 52 F. Supp.

3d 1351, 1374 (CIT 2015) (holding that a reference to a "firm" in 19 C.F.R. § 351.511(a)(2)(iv)

does not refer to the respondent but to "a hypothetical firm located in the [country at issue].")

Canadian Solar mistakenly asserts that Commerce's calculations should be based on the

specific circumstances of the Respondents.[30] As the court has indicated, however, Commerce

has determined that benchmark calculations are assessed based on a hypothetical importer

making a market-price purchase, not the specific parties in a proceeding. See Beijing, 52 F.

---

conditions for the good or service being provided or the goods being purchased in
the country which is subject to the investigation or review. Prevailing market
conditions include price, quality, availability, marketability, transportation, and
other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).

[29] As noted earlier, Commerce has devised a three-tiered hierarchy in determining adequate
remuneration. See 19 C.F.R. 351.511(a)(2)(i)-(iii).

[30] The court does not evaluate whether Canadian Solar actually imported the goods at issue, but
will assume so for the sake of argument.

Supp. 3d at 1374. Basing calculations on a hypothetical importer rather than the respondent in a

given administrative review is not a plainly erroneous interpretation of 19 C.F.R. §

351.511(a)(2)(iv).  See Auer v. Robbins, 519 U.S. 452, 461 (1997) (finding that an agency's

interpretation of its own regulations controlling unless plainly erroneous or inconsistent with the

regulation). Commerce found, freight charges would be paid by an importer of aluminum, solar

glass, and polysilicon.  See Prelim. I&D Memo at 34, 36, 37.  Commerce was thus required to

add international freight charges in order to calculate an accurate benchmark for the products in

question.  See Essar Steel Ltd. v. United States, 678 F.3d 1268, 1274 (Fed. Cir. 2012) (finding

that adding freight to the world market price was required by 19 U.S.C. § 1677(5)(E) as a

prevailing market condition).  Accordingly, Commerce's inclusion of international freight

charges in its benchmark calculations is supported by substantial evidence and is in accordance

with law.

**b.   Calculation of International Freight Charges for Benchmarking**

**i.   Background**

In determining the proper freight charge to be added for each benchmark calculation,

Commerce averaged two data sets from Maersk and Xenata.  I&D Memo at 33.  The Xenata data

was calculated based on actual prices while the Maersk data was based on price quotes.  Id. at

34.  Canadian Solar argues that because the Maersk Data is based on price quotes rather than

finalized contracts, this data should be excluded from the calculation.  Canadian Solar Br. at 35–

36.  Further, Canadian Solar contends that the use of such data is not in accordance with

Commerce's own regulations.  Id.

**ii.   Discussion**

Under 19 C.F.R. § 351.511(a)(2), Commerce is required to calculate "the price that a firm actually paid or would pay if it imported" the product at issue. In making this calculation, this court has previously allowed Maersk's datasets based on price quotes for international freight charges rather than finalized contracts.  See TMK IPSCO v. United States, 222 F. Supp. 3d 1306, 1320–21 (CIT 2017) (finding that using Maersk's estimates was reasonable). Commerce's regulations require that "[w]here there is more than one commercially available world market price, [Commerce] will average such prices to the extent practicable." 19 C.F.R. 351.11(a)(2)(ii).

Commerce did not err in averaging the two datasets in determining the proper international freight benchmark.  The regulation requires only that the price calculated reflect what a firm paid or would pay.  This determination can properly be made on generally-available price quotes, so long as the source of those price quotes is a reputable source. Given Maersk's prominent position in the shipping market, Commerce properly considered the Maersk data to be a reliable world market price and averaged it with the Xenata data. As long as Commerce adequately justified why it chose to average the given datasets, as it did here, a set will not be excluded simply because it is based on a price estimate rather than completed contracts. See I&D Memo at 33–34. The benchmark calculation is sustained.

## VI.    Use of Value-Added Tax in calculating LTAR

### i.  Background

In its final determination, Commerce included value-added tax (VAT) in determining the appropriate benchmark prices.  I&D Memo at 38–39.  Canadian Solar claims that the addition of VAT is not an allowable adjustment under the regulation.  Canadian Solar Br. at 36–38.  They claim that VAT cannot be properly categorized as a delivery charge or import duty, but is rather

an indirect tax, the inclusion of which inflates the apparent benefit received.  Id. at 37; see 19

C.F.R. § 351.102(b)(28).  In addition, Canadian Solar argues that because VAT is later recouped,

it should not be included. Canadian Solar Br. at 38.

      SolarWorld counters that failing to include the VAT would distort the benefit calculated.

SolarWorld Resp. at 39–40.  The Government argues that the mandate of the statute is to

calculate what an importer would pay at the time of import–which includes VAT–and that in

calculating this figure, Commerce does not account for potential reimbursement after import.

Def. Br. at 42–43.

### ii.  Discussion

      Under the relevant regulation, Commerce adjusts benchmark prices to include delivery

charges and import duties that an importer would pay in order to arrive at the "delivered price."

See 19 C.F.R. § 351.511(a)(2)(iv).  The court has previously found the inclusion of VAT in this

calculation appropriate.  See Beijing, 52 F. Supp. 3d at 1372–1375 (holding that the inclusion of

VAT in a tier-two benchmark was correct).  The relevant statute says that when determining the

adequacy of remuneration Commerce should take into account market conditions including

"price, quality, availability, marketability, transportation, and other conditions of purchase or

sale."  19 U.S.C. § 1677(5)(E).

      Here, Canadian Solar's contention that the inclusion of VAT is not allowable under the

regulation fails.  The relevant regulation states that the benchmark should be adjusted to reflect

the "delivered price" meaning the "price that a firm actually paid or would pay if it imported the

product." 19 C.F.R. § 351.511(a)(2)(iv).[31] Commerce determined that VAT would be paid in

this situation and Canadian Solar has offered no evidence showing that to be incorrect. It is

immaterial that the regulations may classify VAT as an indirect tax; the regulation does not say

that the delivered price <u>only</u> includes delivery charges and import duties, just that it <u>does</u> include

these figures. VAT is properly classified as a market condition under the statute, and is thus may

be included in calculating the benchmark for adequate remuneration. <u>See</u> 19 U.S.C. §

1677(5)(E). Therefore, Commerce's addition of VAT to the benchmark was supported by

substantial evidence and otherwise in accordance with law.

## VII.  Electricity Subsidy

### a.  Background

After finding that the GOC failed to fully cooperate in responding to questions regarding

the alleged provision of electricity for LTAR, Commerce applied AFA to determine that there

was a specific subsidy and subsequently to calculate the benefit conferred.[32] <u>I&D Memo</u> at 40–

41; <u>Prelim. I&D Memo</u> at 27–28. When a party fails to respond to "the best of its ability" with

---

[31] The full text of this provision reads:
> "Use of delivered prices. In measuring adequate remuneration under paragraph (a)(2)(i)
> or (a)(2)(ii) of this section, the Secretary will adjust the comparison price to reflect the
> price that a firm a actually paid or would pay if it imported the product. This adjustment
> will include delivery charges and import duties." 19 C.F.R. § 351.511(a)(2)(iv).

[32] Commerce found that the GOC failed to provide satisfactory responses to questions necessary
to ascertain whether the electricity schedules were calculated based on market principles. <u>I&D
Memo</u> at 41. Specifically, the GOC did not provide full responses to questions regarding "(1)
how increases in the cost elements in the price proposals led to retail price increases for
electricity; (2) how increases in labor costs, capital expenses, and transmission and distribution
costs are factored into the price proposals for increases in electricity rates; and (3) how the cost
element increases in the price proposals and the final price increases were allocated across the
province and across tariff end-user categories." <u>Prelim. I&D Memo</u> at 27–28.

reasonable requests for information, Commerce may apply AFA in order to prevent that party

from benefitting from its non-cooperation and to encourage future participation. See Nippon

Steel Corp., 337 F.3d 1373 at 1382; Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d

1365, 1373 (Fed. Cir. 2014). Commerce relied on AFA in finding that there was a subsidy, that

the subsidy was specific, and in calculating the benchmark.  I&D Memo 40–42. Commerce

selected the highest rate schedule on record for each reported category and used those rates to set

a benchmark. See I&D Memo at 41; Prelim. I&D Memo at 28.   Commerce states that this

calculation is reasonable because without information on how electrical rates are determined, it is

plausible that a respondent would bear the highest rate regardless of a plant's location.   I&D

Memo at 41; see also Def. Br. at 44, 46.

Canadian Solar argues that Commerce failed to adequately determine that the electricity

subsidy was specific.  Canadian Solar Br. at 39–41.  According to Canadian Solar, it could

qualify only as a domestic subsidy under 19 U.S.C. § 1677(5A)(D) because electricity cannot be

imported or exported.[33]  Id. at 40.  In its reply brief, Canadian Solar further argues that

Commerce failed to make a specificity determination at all and simply concluded that the

provision of electricity was countervailable without an explanation.  Canadian Solar Reply at 16–

19.  Finally, Canadian Solar and Trina disagree with Commerce's application of the highest rate

from six different provinces in China given that a particular factory cannot exist in more than one

---

[33] Several countries around the world, including China, export electricity. See, e.g., The World
Factbook: Country Comparison Electricity-Exports, Central Intelligence Agency at
https://www.cia.gov/library/publications/the-world-factbook/rankorder/2234rank.html (listing
countries by the amount of electricity they exported in 2015). But Commerce seems to be
addressing a domestic subsidy here.

location.  Canadian Solar Br. at 41; Trina Br. at 26.   Canadian Solar argues that Commerce

failed to cite anything supporting the notion that the subsidy was geographically specific.

Canadian Solar Br. at 40.[34]   Trina further argues that the GOC supplied enough information to

prove that electricity pricing varies by province.  Trina Br. at 24.  Trina contends that the record

proves that plants at issue would not have been subjected to the electricity rates of provinces in

which they were not located.  Id.  Trina presents various ways in which Commerce could have

calculated the rate while still applying AFA.  Trina Br. at 27.

### i.  Discussion

The court has upheld the application of AFA in determining that a given subsidy was

specific when a party has failed to cooperate.  See RZBC Grp. Shareholding Co. Ltd. v. United

States, 100 F. Supp. 3d 1288, 1296–97 (CIT 2015) (sustaining an application of AFA to

determine that a calcium carbonate subsidy was specific).  In previous cases involving electricity

subsides from China, the court has found an adverse inference appropriate when a party did not

provide enough information to determine whether the rate was set according to market

principles.  See Fine Furniture, 865 F. Supp. 2d at 1262–63.

In this instance, Commerce characterized the GOC's refusal "to answer questions related

to regional electrical differences, including differences between industries" as preventing it from

determining from direct evidence whether the subsidy was specific.  I&D Memo at 41.  It

decided solely on this failure to answer some questions that the subsidy was specific. Commerce,

however, failed to explain the particular facts as to which it was it was drawing an adverse

inference and how that analysis subsequently results in a finding of specificity under one of the

---

[34] In fact, Commerce did not make a finding of geographic specificity.  See I&D Memo at 41.

criteria listed in 19 U.S.C. § 1677(5A).

AFA is not a magic phrase that permits Commerce to skip an analysis of the record. Here, the Government states that the GOC failed to adequately respond with information necessary for Commerce to understand whether the electricity prices were set in accordance with market principles. In response to Commerce's questions, the PRC supplied numerous documents detailing the provision of electricity in China. See Conf. Joint App'x 1 at 35–520.  Rather than explain what information was missing, or how these submissions were deficient, Commerce makes the conclusory statement that the GOC failed to comply and thus Commerce can rightly determine that there is a subsidy, that it confers a benefit, and that it is specific such that the subsidy is countervailable. Prelim. I&D Memo at 27–28. Without combing through the submissions and guessing as to why Commerce found these submissions inadequate, the court is unable to ascertain how Commerce made its decision. The record is simply unclear.

Although Commerce does mention that the electricity program was found countervailable in an earlier administrative review, that earlier decision based on a different record does not clarify how Commerce found for this review period that the provision of electricity continued to provide a financial contribution, whether the subsidy conferred a benefit, and, most relevant here, whether this provision was specific within the meaning of the statute. See 19 U.S.C. § 1677(5)(B); see also Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1356 (2016) (stating that Commerce must "base its decisions on the record of the administrative proceeding before it in each review"). Although the Court of Appeals for the Federal Circuit's decision in Albemarle had to do with Commerce's duty to recalculate dumping margins in each administrative review, except in certain limited circumstances, the principle underlying that

decision holds true here. The purpose of administrative reviews is to reassess earlier

determinations in the light of data relevant to the period of review. See id. at 1356–57. If

Commerce simply relies on findings from an earlier administrative review in reaching a decision

in a current review, it abdicates its responsibility and undermines the central purpose of periodic

reviews.

   This is not to say that Commerce cannot reference the reasoning of a previous

administrative review. But Commerce must give respondents a meaningful opportunity to

dispute earlier findings and offer evidence of changes. If respondents fail to do so, then

Commerce might state that no new evidence merits a reconsideration of a decision made in a

previous administrative review, but Commerce must at the very least explain why a decision

made in an earlier review should control.

   Simply stating that the GOC did not fully comply is insufficient, Commerce must

actually engage in an analysis of the information on the record and explain how adverse

inferences lead to the conclusion that the provision of electricity in China is a countervailable

subsidy. Otherwise stated, Commerce must connect the dots: how does the GOC's partial

response–or failure to respond fully–reasonably lead to a finding of a specific subsidy even with

use of AFA?

   If, on remand, Commerce properly concludes that the provision of electricity in the PRC

amounts to a countervailable subsidy, Commerce's benchmark determination based on record

evidence with appropriate adverse inferences is consistent with its regulations for calculating

benchmarks. See 19 C.F.R. § 351.511(a)(2). The GOC refused to provide certain details

regarding variation of provincial electricity rates and whether these rates were calculated based

on market principles. See I&D Memo at 41. Accordingly, Commerce can apply an adverse

inference to the GOC's electricity rate submissions and select the highest rates for each electrical

category and use those to set a benchmark. See 19 U.S.C. § 1677e(b); 19 C.F.R. §

351.511(a)(2)(iii); Fine Furniture, 865 F. Supp. 2d at 1260–1262 (upholding Commerce's

decision to set the benchmark rate for electricity equal to the highest rate reported in the

provincial price schedules submitted by the GOC when Commerce was unable to determine

whether the prices were set in accordance with market principles). Commerce's goal in setting a

benchmark rate is to best approximate the market rate of electricity, not to choose the rate

respondents were most likely to pay in an electricity market Commerce argues is tainted by the

GOC's interference.

     Finally, although Trina provided potential alternative modes of calculating the

benchmark, it has not shown that these calculation methods result in a better estimate of the

market rate for electricity. It is not this court's place to substitute its judgment for that of

Commerce by selecting a different method of calculation where Commerce has acted within its

lawful discretion and made a reasonable decision.  See Inland Steel Indus., Inc. v. United States,

188 F.3d 1349, 1360–61 (Fed. Cir. 1999). In sum, assuming a countervailable subsidy exists,

Commerce acted in accordance with the law in using the highest of all provincial rates on the

record to calculate the benchmark.

     Accordingly, the issue regarding the provision of electricity is remanded for Commerce

to explain how it arrived at its conclusion that such provision was a countervailable subsidy.

Commerce should cite specific information on the record, noting any allowable adverse

inferences, in making its decision.

**VIII.    Golden Sun Demonstration Program**

### i.  Background

During the original investigation, Commerce found the Golden Sun Demonstration Program ("GSDP") to be countervailable.  See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, From the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Critical Circumstances Determination, 77 Fed. Reg. 63,788 (October 17, 2012) and accompanying issues and decision memorandum at 10–11 ("I&D Memo 2012"). The GSDP was created in 2009 to assist in the construction of photovoltaic electricity-generation projects. See Prelim. I&D at 43.  In its final determination, Commerce found no new information warranting a reexamination of the program and concluded that the subsidy was untied and attributable to Canadian Solar's total sales. I&D Memo at 47. The Government argues that it must only look at the grant when it was bestowed and need not inquire as to how the grant was used specifically.  Def. Br. at 48–50.

Canadian Solar contends that GSDP was meant to subsidize the generation of electricity and not the production of solar cells.  Canadian Solar Br. at 44.  Although Canadian Solar admits that it received GSDP funds, it asserts that Commerce has mischaracterized the program's purpose as providing assistance in the production of solar cells.  Id. at 43–45.  Canadian Solar contends that at the time of bestowal, the subsidy could only be properly attributed to power generation operations and thus Commerce improperly assessed countervailing duties on the production of solar cells.  Canadian Solar Br. at 43–45.  SolarWorld contends that it is unclear from the record whether the grant was intended for electricity production or solar cell production. SolarWorld Resp. at 45–46.

### ii.  Discussion

In the 2012 Final Determination from the initial investigation, Commerce found that the

Golden Sun program subsidized "solar-powered projects." I&D Memo 2012 at 12 (October 17,

2012).  Based on submissions by the GOC, in its preliminary determination Commerce found

that the program supported:

> (1) The use of large-scale mining, commercial enterprises, and public welfare institutions
> to construct the user's side of the electrical grid for photovoltaic power generation
> demonstration projects; (2) increasing the power supply capacity in remote locations; and
> (3) construction of large-scale grid-connected photovoltaic power generation
> demonstration projects in solar energy rich regions." Crystalline Silicon Photovoltaic
> Cells, Whether or Not Assembled Into Modules, From the People's Republic of China:
> Preliminary Affirmative Countervailing Duty Determination C-570-980 POI 01/01/2010-
> 12/31/2010 at 15–16 (Mar. 26, 2012) ("Prelim. I&D Memo 2012")

Based on this information, Commerce determined that grants under this program constitute a

subsidy of enterprises "involved in the construction of solar-powered projects."  Prelim. I&D

Memo 2012 at 16.

Commerce's regulations mandate that "[i]f a subsidy is tied to the production or sale of a

particular product; the Secretary will attribute the subsidy only to that product."  19 C.F.R. §

351.525(b)(5)(i).  When a subsidy is not tied to a specific product, however, it is Commerce's

practice to attribute the benefits of a subsidy based on the stated purpose at the time of

bestowal,[35] as untied subsidies are attributed to all products sold because they benefit all

production. Preamble, 63 Fed. Reg. at 65,400 ("the current benefit of an untied subsidy will be

attributed to the firm's total sales.")

---

[35] "[W]e analyze the purpose of the subsidy based on information available at the time of
bestowal." Preamble, 63 Fed. Reg. at 65,403.

Canadian Solar argues that the language of the program description is not specific to the production of solar cells, but is for energy production broadly.  While this may be true, Commerce reasonably understands this program to include the subsidization of the production of solar cells, despite the inference needed to reach this conclusion.  It is reasonable to assume that creating photovoltaic power generation necessitates the production of solar cells as a component of this endeavor.  Although Canadian Solar may not use the funds received through this program specifically in the production of solar cells, Commerce need only look at the purpose of the subsidy at the time it is bestowed and not exactly how it is used by companies.  Therefore, Commerce's decision is supported by substantial evidence and in accordance with law.

**CONCLUSION**

For the foregoing reasons, the court remands Commerce's challenged determinations as regards to its determination on the Export Buyer's Credit Program, the inclusion of Comtrade data in calculating the world market rate for aluminum extrusions and solar glass, Commerce's decision to revert to a tier-two benchmark in determining the price for polysilicon without considering Respondent's proffered evidence, and the finding that provision of electricity constitutes a specific and thus countervailable subsidy. All other determinations are sustained. The court remands for proceedings consistent with this opinion. Remand results should be filed by January 29, 2019. Objections are due February 28, 2019 and Responses to Objections are due March 15, 2019.

                                                      /s/ Jane A Restani
                                                      Jane A. Restani, Judge

Dated: November 30, 2018
         New York, New York